UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

LATOYA RIDEAU                           CIVIL ACTION

VERSUS                                  NO: 12-1732

GREAT-WEST LIFE & ANNUITY INSURANCE     SECTION: R
COMPANY AND REGIONS INVESTMENT
SERVICES, INC.

<u>**ORDER AND REASONS**</u>

Before the Court is the motion for summary judgment of

defendants Great-West Life & Annuity Insurance Company and

Regions Investment Services, Inc.  For the following reasons, the

Court GRANTS the motion.


**I.    BACKGROUND**

On April 29, 2010, plaintiff Latoya Rideau and her husband,

Christopher Rideau, visited the Regions Bank located at 947 State

Street, Jackson, Mississippi,[1] and met with agent Tammy Lunsford

in order to purchase a $150,000 Great-West life insurance policy

for Mr. Rideau.[2]  Lunsford verbally asked the Rideaus a series of

identification, background, and coverage questions contained in

---

[1] This is the address listed for the bank in plaintiff's
opposition to the motion for summary judgment and statement of
material facts.  In her affidavit, she lists the bank's address
as 5400 Highway 18, Jackson, Mississippi.

[2] R. Doc. 23-1 at 1.

the policy application.[3]  Lunsford then entered the Rideau's "yes" or "no" responses into a computer system that creates a completed application, which is then printed for the applicant's review and signature.[4]  Plaintiff claims that the computer screen was facing Lunsford at all times and that the Rideaus were unable to see the questions.[5]

The policy application contained the following question to be answered "yes" or "no":

In the past five years, have you
      (1) used illegal drugs?
      (2) been convicted or incarcerated for a felony, or are
      you currently on probation or parole?[6]

Plaintiff claims to have told Lunsford at some point during their meeting that Mr. Rideau had been released from prison the previous day, even showing Mr. Rideau's prison release papers as a form of identification.[7]  She further alleges that when asked whether Mr. Rideau had been incarcerated, the Rideaus told Lunsford that he had been convicted of a felony eight and a half years earlier.[8]  According to plaintiff, Lunsford responded "Oh,

_____

[3] *Id.*

[4] R. Doc. 20-8 at 2.

[5] R. Doc. 23-1 at 1.

[6] R. Doc. 20-1 at 24.

[7] R. Doc. 23-1 at 1.

[8] *Id.*

2

that was not in the last five years so we are good."[9]  Lunsford
does not recall her interaction with the Rideaus, but she also
does not recall any applicant disclosing a past incarceration to
her.[10]

Lunsford printed the completed application and gave it to
Christopher for his signature.[11]  The application contained the
following certification above the signature block:

> I certify: 1) All statements and answers to the questions in
> this application and any supplement to it are true.  2) This
> application will form a part of the insurance contract with
> Great-West Life & Annuity Insurance Company . . . . 4) The
> policy applied for takes effect on the date of this
> application provided that a) questions on the application
> have been answered truthfully; and b) the application for
> coverage is not declined . . . .[12]

Plaintiff alleges that Mr. Rideau signed the application
without reading it.[13]  Great-West issued the policy on May 6,
2010, based on the responses contained in the application and a

---

[9] *Id.*

[10] R. Doc. 20-6 at 6-9.

[11] R. Doc. 20-7 at 2.  In her affidavit, plaintiff contends
that Lunsford gave only the last page of the application to
Christopher for his signature.  This assertion appears to
contradict a letter sent by plaintiff's attorney to Great-West,
the text of which is included *infra*, claiming that "[t]he
application was . . . presented to Christopher Rideau for his
signature."  Plaintiff later affirmed the accuracy of the letter
in her deposition.  R. Doc. 24-3 at 5.  Whether Lunsford gave
Christopher the entire application for review is immaterial to
the Court's disposition.

[12] R. Doc. 20-1 at 26.

[13] R. Doc. 23-1 at 2.

medical background check.  It is undisputed that Mr. Rideau's application would have been denied if he had answered "yes" to the incarceration question or to any other criminal or medical history question in the application.[14]

Christopher Rideau died from gunshot wounds in July of 2011, and plaintiff, as the sole beneficiary of the policy, submitted a claim shortly thereafter.[15]  Because Rideau died within the two-year contestable period, Great-West investigated.[16]  It learned that Rideau had been convicted of second-degree kidnapping and assault on a police officer and had been released from prison the day before he applied for the insurance policy.[17]  Great-West's Senior Claims Manager concluded the Mr. Rideau had falsely answered the incarceration question and that the omission constituted a material misrepresentation warranting rescission of the policy.[18]  The Claims Manager informed plaintiff of her decision in a letter dated August 31, 2011, in which she enclosed a refund check for the premiums paid on the policy.[19]  The letter read in part:

---

[14] R. Doc. 20-3 at 3; R. Doc. 20-4 at at 7.

[15] R. Doc. 23-1 at 2.

[16] R. Doc. 20-7 at 3; R. Doc. 20-8 at 3.

[17] R. Doc. 20-8 at 3.

[18] *Id.* at 5.

[19] R. Doc. 20-2 at 25.

4

During our claim investigation we obtained information indicating that our deceased insured had been incarcerated for a felony within 5 years prior to application for this insurance policy and failed to note it with a "yes" response on the application.  This omission resulted in material misrepresentation that would have resulted in our not issuing this policy had we been properly informed at the time of application.

As a result of the material misrepresentation in the application, we regret that we must rescind the policy and consider it void.  As such, no benefits are payable in this instance. . . .

As this policy has been rescinded, we are refunding all premiums paid on the policy.  Enclosed please find a check in the amount of $495.10 representing a full refund of all premiums paid in the amount of $495.00 and 53 days of interest at 0.14% totaling an additional $0.10.

Approximately one month later, plaintiff returned the refund check along with an appeal letter, which stated in part:

I, LaToya Rideau, am writing in response to the denial letter I received from your company regarding the claim made on my husband Christopher Rideau. On April 28, 2010 my husband Christopher Rideau was released from prison after serving an 8 ½ year sentence. We immediately relocated from New Orleans, LA to Jackson, MS.  While in Jackson, we obtained a MS State ID for Chris and went to the Regions Bank to open a checking account and get a Life Insurance Policy on Chris. I already have a term life policy through Great West and wanted my husband to be covered as well.

At Regions Bank in Jackson, MS we sat down with the Licensed Rep and began the process of getting a new account and opening a term life policy. The Rep began asking questions for the term policy. When asked if he was ever convicted of a felony, we both told her he had just gotten out of prison. She asked what for and we told her. She then asked when Chris had been convicted and we both told her 8 ½ years ago. She responded by saying 'Oh, that was not in the last 5 years so we are good.' She never asked us anything about being on parole. I guess she assumed that since the conviction was more than 5 years ago, it did not apply. . . .

5

Christopher Rideau was murdered and Great West denied the claim on the grounds that we lied on the application. All the information given to the Bank Rep was true and she made her own determination. The Bank Rep was also given Christopher's release papers to review. As a Regions Bank and a Great West customer, I trusted that the Bank Rep was knowledgeable when writing the policy. I in no way shape or form attempted to defraud Great West by withholding information or giving false information.

Please find enclosed the check in which I received with the denial letter from Great West.

At this time I am asking that my claim be reconsidered and reviewed for approval.[20]

Great-West denied plaintiff's appeal in a letter dated

October 6, 2011, which stated in part:

In your letter, you stated that you disclosed your husband's incarceration to the agent.  Even assuming that the agent misinterpreted the question, Mr. Rideau was provided with an opportunity to correct any error when he signed the application.  His signature acknowledged the wording in the section above it which states: *'I certify: 1) All statements and answers to the questions in this application and any supplements to it are true.'*

As the policy is void, you are entitled to a full refund all [sic] premiums paid on the policy.  We are returning the premium refund check in the amount of $495.10 that was initially sent to you on August 31, 2011.[21]

Plaintiff negotiated the check on October 13, 2011, approximately

four and a half months before the check's expiration date.[22]

Five months later, plaintiff's counsel sent another letter

---

[20] *Id.* at 26.

[21] *Id.* at 27 (emphasis in original).

[22] *Id.* at 32.

6

to Great-West disputing the denial of the insurance benefits.[23]
The letter indicated that plaintiff would file suit if she did
not receive the policy proceeds within 14 days.[24]  Great-West
responded on March 27, 2012, again denying the claim.[25]

On May 17, 2012, plaintiff sued Great West, Regions, and
Tammy Lunsford.[26]  Great-West removed the case to federal court
on July 3, 2012.[27]  Lunsford was dismissed as a party in an order
dated March 13, 2013.[28]  Great-West and Regions filed this motion
for summary judgment on September 23, 2013.


**II.  LEGAL STANDARD**

Summary judgment is warranted when "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986);
*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
When assessing whether a dispute as to any material fact exists,
the Court considers "all of the evidence in the record but

---

[23] *Id.* at 28.

[24] *Id.* at 29.

[25] *Id.* at 30.

[26] R. Doc. 1-1.

[27] R. Doc. 1.

[28] R. Doc. 11.

refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). The Court must draw all reasonable inferences in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (internal quotation marks omitted).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991)(citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The

8

burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.

The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *Id.* at 325. *See also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (citing *Celotex*, 477 U.S. at 332).

## III. DISCUSSION

Defendants argue that summary judgment is appropriate because plaintiff accepted Great-West's rescission of the policy and waived her contractual rights by negotiating the premium refund check after her appeal was denied.  They rely on *Avemco Ins. Co. v. Northern Colorado Air Charter, Inc.*, 38 P.3d 555 (2002), in which the Colorado Supreme Court examined the principles of mutual rescission as articulated by numerous jurisdictions before concluding that the negotiation of a refund check generally constitutes acceptance of rescission.  It held:

> Mutual rescission renders the insurance contract void *ab initio*.  Mutual rescission may be manifested by conduct; no written agreement is necessary.  When an insurer mails a letter to an insured stating its intent to rescind and

tenders a check to the insured representing a refund of the premiums, and the insured understands the intent to rescind when cashing the check, a meeting of the minds is deemed to have occurred. . . .

Such meeting of the minds is evidenced by "acts, conduct and words, taken in connection with the attendant circumstances," and is not evidenced by any subjective, unexpressed intent by either party. . . . Because such meeting of the minds is evidenced through words or conduct, the subjective intent of either party is not dispositive of the issue of meeting of the minds. In fact, "[a]s in any contract, the subjective intent of the parties to a contract of rescission is immaterial. A mutual rescission is effected, if at all, on the basis of the parties' objective manifestations of assent.". . .

Additionally, even if there exists a good-faith controversy between the parties regarding the insurer's right to rescind, the acts of the insurer tendering the check with the explicit representation that the check is offered to effectuate a rescission, and the cashing of that check by the insured with knowledge of the insurer's intent to rescind, renders the rescission effective notwithstanding the contested grounds for the rescission in the first instance: . . .

*Id.* at 559 (citations omitted).  Several jurisdictions agree that mutual rescission depends on the intent of the parties as evidenced by their acts and the attending circumstances, and that the act of negotiating a refund check after notice of cancellation at least raises an inference of mutual rescission. *See, e.g., Pruco Life Ins. Co. v. Wilmington Trust Co.*, 721 F.3d 1, 7-8 (1st Cir. 2013) (applying Rhode Island law); *Lundy v. Lititz Mut. Ins. Co.,* 100 S.E.2d 544, 547 (S.C. 1957); *Peterson v. New York Life Ins. Co.,* 240 N.W. 659, 660 (Minn. 1932); *Mut. of Omaha Ins. Co. v. Korengold*, 241 N.W.2d 651, 652 (Minn. 1976);

Miller v. Montgomery, 427 P.2d 275, 276 (N.M. 1967) (citing

*Warren v. New York Life Ins. Co.*, 58 P.2d 1175, 1180 (N.M. 1936)

(rescission found based solely on retention of check for six

months, even though it was never cashed)); *First Penn-Pac. Life*

*Ins. Co. v. Evans*, 313 F. App'x 633, 637 (4th Cir. 2009)

(applying Maryland law).

    The only Louisiana case on point[29] is *Massachusetts*

---

    [29] *Vest v. Richardson*, 253 So.2d 97 (La. Ct. App. 1971),
does not address the issue of mutual rescission and is not
applicable to this case.  In *Vest*, the insured's
misrepresentation was clear and the insurer indisputably had the
right to rescind the policy unilaterally.  The only question in
that case was whether the insurer had actually effectuated a
rescission, because there was no evidence that the rescission
letter or refund check ever reached the plaintiff.

The court acknowledges that both *McLelland v. Security Industrial
Insurance Co.*, 426 So.2d 665 (La. Ct. App. 1982), and *Wall v.
Northwestern Mutual Life Insurance Co.*, CIV.A. No. 06-2365, 2008
WL 4450283 (W.D. La. Sept. 29, 2008), involved plaintiffs who
negotiated their premium refund checks before filing suit.  In
both instances, the insurer specifically pleaded the defense of
accord and satisfaction, which the court rejected based on the
particular facts of the case.  Likewise, defendants in this case
would not be entitled to summary judgment based on that defense.
*See* La. Rev. Stat. art. 3079 (codifying the doctrine of accord
and satisfaction and requiring "the clearly expressed written
condition that acceptance of the payment will extinguish the
obligation.").  Defendants, however, do not contend that the
acceptance of the refund check resulted in an accord and
satisfaction, which is defined as a payment of an amount less
than a disputed claim offered in full settlement of the dispute.
*See Complete Med. Sys. L.L.C. v. Health Net Fed. Servs., L.L.C.*,
No. 2013 CA 0367, 2013 WL 5872044, *3, --- So.3d --- (La. Ct.
App. Nov. 1, 2013).  Defendants did not make an offer in
settlement of a disputed claim that would constitute new
consideration; rather, they returned only the amount of money to
which plaintiff would be entitled if the policy were void.
Consistent with that action, they now argue that the plaintiff
consented to rescission and/or waived her claim by accepting a

*Indemnity & Life Insurance Company v. Humphreys*, 644 So.2d 818
(La. Ct. App. 1994), a decision of the Louisiana First Circuit
Court of Appeal involving another plaintiff who negotiated a
premium refund check after being informed that a life insurance
policy was void.   In *Humphreys*, the Jacksons sought to obtain a
spouse rider for the husband on the wife's life insurance policy.
Humphreys, Mr. Jackson's former wife, already had a spouse rider
on his life.   *Id.* at 819.   Under the insurer MILICO's policies,
the rider could not be transferred until Humphreys consented in
writing.   *Id.*   MILICO mistakenly informed Mrs. Jackson that the
rider could be transferred without Humphreys's signature upon
submission of a judgment of divorce and two policy change
application forms.   *Id.*   After Mrs. Jackson followed these
instructions, MILICO issued the spouse rider.   *Id.* at 820.   The
next day, however, MILICO's vice president informed Mrs. Jackson
by letter that without Humphreys's signature, the spouse rider
could not be transferred.   *Id.*   A check refunding the premium was
included with the letter, and Mrs. Jackson negotiated the check.
*Id.*

   When Mr. Jackson died five months later, Mrs. Jackson

---

refund of the premium with the understanding that West–Life
considered the policy void.   There is no reason to believe these
defenses are mutually exclusive, and as discussed below, multiple
jurisdictions that recognize the doctrine of accord and
satisfaction also acknowledge the defense of mutual rescission in
this context.

submitted a claim for the insurance proceeds, which the insurer

denied. *Id.* She sued the insurer, and the district court

determined that she was entitled to the proceeds. *Id.* On

appeal, MILICO argued that by cashing the refund check after

being informed that the coverage was improvidently issued, Mrs.

Jackson had assented to rescission of the coverage. *Id.* The

Court dismissed MILICO's attempts to characterize the spouse

rider as "invalid," noting that the insurer's error in issuing

the coverage did not vitiate its consent to the contract, which

was valid from its inception. *Id.* After observing that there

were no allegations of misrepresentation in the case, the Court

then turned to question of whether Mrs. Jackson nonetheless

consented to rescission of the rider:

> The record reflects that Mrs. Jackson's decision to cash the
> premium refund check was based on information provided to
> her in the MILICO letter. We agree with the district
> court's conclusion that:
>
> ... DEFENDANT'S NEGOTIATION OF THE PREMIUM REFUND CHECK DID
> NOT CONSTITUTE A KNOWING AND VOLUNTARY WAIVER OF THE "SPOUSE
> RIDER" VALIDLY ISSUED BY PLAINTIFF.... PLAINTIFF CLEARLY
> INDICATED THAT THE "SPOUSE RIDER" WAS IN FACT INVALID AND/OR
> VOID FROM THE DATE OF ISSUANCE.... IN THAT DEFENDANT'S
> DECISION TO NEGOTIATE THE PREMIUM REFUND CHECK WAS BASED
> UPON THIS MISLEADING CORRESPONDENCE, SAID NEGOTIATION DID
> NOT CONSTITUTE A KNOWING AND VOLUNTARY RESCISSION.
>
> Because MILICO did not have the right to rescind the
> contract and because Mrs. Jackson did not knowingly consent
> to a rescission, the policy remains in force.

*Id.*

Plaintiff reads *Humphreys* to preclude a finding of knowing

13

and voluntary consent to rescission whenever the insurer would not be able to prevail on the merits of its misrepresentation defense.  To interpret the Court's holding in this way would eviscerate the concept of mutual rescission altogether.  Courts would be required to consider an insurer's misrepresentation defense on the merits first.  Only if the defendant had the right to rescind would consent to rescission be valid, and under such circumstances, consent to rescission would be immaterial because the insurer would have the right to rescind the policy unilaterally.

The Court reads *Humphreys* as standing for the more sensible proposition that an insurer may not declare void a policy without any good-faith basis for disputing its validity and then rely on the insured's decision to negotiate a refund check as absolving it of liability. It was, as the *Humphreys* court noted, misleading for MILICO to inform the insured that the policy was void when MILICO knew the insured had made no misrepresentations in her application.  It does not follow that an insurer misleads an insured each time it attempts to rescind a policy it considers void. This is especially true when the insurer clearly explains the basis for its good-faith belief that a policy is void due to misrepresentation.

This reading of *Humphreys* is consistent with the rule of other jurisdictions that an insurer must have a good-faith basis

14

for seeking rescission.  *See Avemco*, 38 P.3d at 559 (holding that mutual rescission can be effective notwithstanding contested grounds for rescission, so long as there is a good-faith basis for the dispute).  Absent bad faith, an insurer need not demonstrate its ability to succeed on the merits at trial.  *See Pruco*, 721 F.3d at 9-10 (noting that under Rhode Island law, "whether a party to a contract has a valid right to rescind is relevant only in the case of a unilateral rescission claimed as of right by the rescinding party, not in a case of mutual rescission.") (internal quotation marks omitted)).

Here, there is simply no evidence that Great-West acted in bad faith when it informed plaintiff that it considered the policy void.  Great-West presented plaintiff with indisputable evidence that the incarceration question had been answered falsely, and it explained (correctly) that the policy would not have issued if the question had been answered truthfully.  It pointed to language in the contract that it believed supported its position that Christopher was responsible for the misrepresentations even if he verbally informed Lunsford that he has been incarcerated.  Whether Great-West's position was correct as a matter of law is irrelevant, as it was not without some support and was far from frivolous.  *See English v. Jackson Nat. Life Ins. Co.*, CIV.A. 97-30092, 1997 WL 464613 (5th Cir. Aug. 1, 1997).

Moreover, the facts and circumstances of this case compel the conclusion that the plaintiff acted knowingly and voluntarily when she negotiated the check.  That she held on to the check for a month while contemplating her course of action and ultimately returned it along with her appeal letter demonstrates her understanding of the consequences of accepting the refund. Moreover, the wording of the letter suggests that plaintiff was sufficiently educated and informed to understand Great-West's position.  Finally, plaintiff waited five months after cashing the check before she renewed her objections.  *See Klanian v. New York Life Ins. Co.*, 26 A.2d 608, 612-13 (R.I. 1942) (suggesting that an insured's decision to wait a significant amount of time before negotiating a refund check, or after negotiating the check and before objecting to the rescission, reinforces the inference of mutual rescission); *see also Pruco*, 721 F.3d at 8 (citing *Klanian* for the same proposition).  Plaintiff's argument that she negotiated the check because of its expiration date is unavailing.  The check would have remained valid for nearly five months after her appeal was denied, leaving plenty of time to respond to the denial or to file suit.

"[A] party's unexpressed intentions, evidenced by nothing more than that party's bare, post hoc assertions," are insufficient to overcome an inference of mutual rescission. *Pruco*, 721 F.3d at 8; *see also Avemco*, 38 P.3d at 563 ("[I]n

16

order to overcome the inference of rescission, the insured must offer evidence, beyond a subjective intent not to rescind, to rebut the acts of the insurer and the insured.")  Plaintiff has produced no evidence that would overcome the inference of mutual rescission raised by the facts and circumstances of this case. Because the Court holds that plaintiff consented to rescission when she negotiated the premium refund check, it need not determine whether Christopher Rideau's failure to correct the answer to the incarceration question arose to the level of misrepresentation.

**IV.  CONCLUSION**

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment.

New Orleans, Louisiana, this <u>8th</u> day of November, 2013.

_Sarah Vance_
_____
SARAH S. VANCE

UNITED STATES DISTRICT JUDGE